**CLARKSON LAW FIRM, P.C.**
Glenn A. Danas (SBN 270317)
*gdanas@clarksonlawfirm.com*
Cody Laux (SBN 359748)
*claux@clarksonlawfirm.com*
Maxim Gorbunov (SBN 343128)
*mgorbunov@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone: (213) 788-4050
Facsimile: (213) 788-4070

**CLARKSON LAW FIRM, P.C.**
Kristen G. Simplicio (SBN 263291)
*ksimplicio@clarksonlawfirm.com*
1050 Connecticut Avenue NW, Suite 500
Washington, DC 20036
Telephone: (202) 998-2299

*Attorneys for Plaintiff and Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENAVIE CAHILIG, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LE-VEL BRANDS, LLC; JASON CAMPER; SOPHARY LY; CLIFF GALLAGHER; JAYSON JORGENSEN; SHELLEY HILL; SHANNON SCHMIDT; CHANTE MARKUS and DOES 1–50, inclusive,<br><br>Defendants. | Case No.: 3:25-cv-05051-JD<br><br>**FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT**<br><br>1.  Failure to Pay Minimum Wage and Liquidated Damages (Cal. Lab. Code §§ 1182.12, 1194, 1197, 1197.1, 1198; IWC Wage Order 4-2001);<br>2.  Failure to Timely Pay Wages During Employment (Cal. Lab. Code § 204);<br>3.  Failure to Keep Requisite Payroll Records (Cal. Lab. Code § 1174(d));<br>4.  Failure to Provide Timely and Accurate Wage Statements (Cal. Lab. Code § 226(a), 226(e));<br>5.  Failure to Reimburse Business Expenses (Cal. Lab. Code §§ 450, 2802; IWC Wage Order 4-2001);<br>6.  Unfair Competition (Bus. & Prof. Code § 17200 et seq.)<br>7.  Violations of the Private Attorney General Act (Cal. Lab. Code §§ 2698-2699.8)<br><br>**JURY TRIAL DEMANDED** |

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

**<u>TABLE OF CONTENTS</u>**

<u>Page No.</u>

I.    INTRODUCTION .................................................................................................1

II.   JURISDICTION AND VENUE .........................................................................4

III.  THE PARTIES.....................................................................................................5

IV.   FACTS COMMON TO ALL CLASS MEMBERS AND AGGRIEVED EMPLOYEES......8

    A.    Le-Vel Is a Successful Multilevel Marketing Company That Is Dependent on its Brand Promoters to Engage in Social Media Marketing on Its Behalf.......................8

    B.    Le-Vel Brand Promoters Are Employees .................................................11

        1.    Controlling Law ...........................................................................11

        2.    Brand Promoters Are Not Free from Le-Vel's Control .................13

        3.    Brand Promoters' Work Is Not Outside Le-Vel's "Usual Course of Business"...................................................................................15

        4.    Le-Vel Cannot Meet Its Burden To Show That Brand Promoters Are "Customarily Engaged" in a Separate Business ...........................15

        5.    Le-Vel Brand Promoters Are Not "Direct Sellers."........................17

            i.    Background on MLMs and the Direct Sales Exemption. ........................18

            ii.   Le-Vel Brand Promoters Do Not Perform the Jobs Identified in the Direct Sales Exemption.................................................................18

            iii.  Le-Vel's Modern E-Commerce Business Is Unlike Past and Present Direct Sales Companies. ..................................................................22

        6.    The Terms and Conditions in the Brand Promoter Agreement are Unconscionable, Unfair, and Unlawful. ........................................23

    C.    Le-Vel's Misclassification of Plaintiff and Brand Promoters Was Willful...............25

    D.    Le-Vel's Misclassification of Brand Promoters and Unfair Business Practices Harm the California Public. ........................................................................26

        1.    Le-Vel Uses Widespread Advertising Practices Directed at the General Public to Recruit New Brand Promoters.........................................27

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

2.    Le-Vel's Unfair and Unlawful Conduct Harms California In Other Ways. ..28

E.    Plaintiff's Experiences as a Le-Vel Brand Promoter ...................................30

V.    CLASS ALLEGATIONS ..................................................................................32

VI.   FACTS RELATING TO PLAINTIFF AS A PRIVATE ATTORNEY GENERAL.............34

VII.  CAUSES OF ACTION ......................................................................................36

FIRST CAUSE OF ACTION ..............................................................................36

SECOND CAUSE OF ACTION ..........................................................................38

THIRD CAUSE OF ACTION ..............................................................................39

FOURTH CAUSE OF ACTION ..........................................................................40

FIFTH CAUSE OF ACTION ..............................................................................41

SIXTH CAUSE OF ACTION ..............................................................................43

"Unlawful" Prong ...............................................................................43

"Unfair" Prong ...................................................................................44

SEVENTH CAUSE OF ACTION ........................................................................45

EIGHTH CAUSE OF ACTION ...........................................................................47

VIII. PRAYER FOR RELIEF ....................................................................................48

IX.   DEMAND FOR TRIAL BY JURY .....................................................................49

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1    Plaintiff JENAVIE CAHILIG brings this action, individually, and behalf of a class of
2  similarly situated individuals, against LE-VEL BRANDS, LLC; JASON CAMPER; PAUL
3  GRAVETTE; SOPHARY LY; CLIFF GALLAGHER; JAYSON JORGENSEN; SHELLEY HILL;
4  SHANNON SCHMIDT; CHANTE MARKUS and DOES 1–50, inclusive, (collectively,
5  "Defendants" or "Le-Vel"). Plaintiff's allegations against Defendants are based upon investigation
6  carried out by Plaintiff's counsel, except for allegations pertaining specifically to Plaintiff, which
7  are based upon Plaintiff's personal knowledge.

8  **I.    INTRODUCTION**

9    1.    Le-Vel is a massively successful company that, for years, has exploited its California
10  salesforce by misclassifying its workers as independent contractors rather than as employees.
11  Plaintiff is a Le-Vel "Brand Promoter," one of many active sales workers in California who sells
12  Le-Vel products through their online networks under Le-Vel's strict direction and control. In
13  exchange for Brand Promoters' work promoting the brand on social media, acquiring new
14  customers, engaging existing customers, providing customer service, recruiting and training new
15  Brand Promoters, and driving traffic to Le-Vel's website, Le-Vel pays them, at most, a paltry
16  commission.

17    2.    Headquartered in Frisco, Texas, Le-Vel develops and sells a wide range of health and
18  wellness products, focusing on nutritional support and weight management. Le-Vel products
19  include dietary supplements containing vitamins, minerals, plant extracts, antioxidants, enzymes,
20  probiotics, and amino acids as well as transdermal patches for weight loss. Pursuant to Le-Vel's
21  business model, it establishes relationships with various individuals known as Brand Promoters who
22  market and sell Le-Vel products. Le-Vel has spent a great deal of time and resources implementing
23  and managing a broad range of employment policies and procedures for their Brand Promoters.
24  Despite designating these salespeople as independent contractors, Brand Promoters are in fact Le-
25  Vel employees under California law. Le-Vel has violated numerous provisions of the California
26  Labor Code and applicable IWC Wage Order by denying its Brand Promoters the compensation,
27  other benefits and statutory entitlements that they are owed.

28

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

3.      Le-Vel maintains a centralized, rigorous, and stringent sales policy to which each of its Brand Promoters must rigidly adhere should they expect any commission for their sales of Le-Vel products. Even when these Brand Promoters do follow Le-Vel's exacting direction to the tee, the majority of Brand Promoters fail to even break even, having sunk substantial personal investment into marketing Le-Vel products—business expenditures which Le-Vel shifts onto their frequently financially insecure, female workers and which Le-Vel refuses to reimburse.

4.      Via its pervasive marketing and sales guidelines, Le-Vel directed Brand Promoters to market and sell a variety of consumer products, nutritional support and weight management products. In exchange for the Brand Promoters' work promoting the brand on social media, referring new customers, providing customer service, and driving traffic to Le-Vel's website, Le-Vel pays Brand Promoters at most a paltry commission.

5.      Le-Vel's ability to avoid accountability to its employees thus far—turns on the fact that it operates as multi-level marketing business ("MLM").[1] Le-Vel's recruitment tactics purportedly promise its Brand Promoters the opportunity to build a business; in reality, however, they supply free marketing and sales support for Le-Vel.

6.      California legislature's codification of the "ABC Test" in AB 5 did include a "direct sales" exemption, which incorporated a definition appearing in a 40-year-old statute, California's Unemployment Code § 650. Among other things, the exemption is expressly limited only to those salespersons making "in person" sales, such as door-to-door salespeople and home "Tupperware party" hosts. It does not cover Le-Vel's modern, online business model, where Brand Promoters drive social media engagement under Le-Vel's guidance and direction, directing consumers to Le-Vel-controlled websites, where Le-Vel accepts and processes the sales and fulfills the orders, while also collecting and benefiting from the consumer data it acquires from these leads. The result is a coordinated marketing campaign that increases exposure and awareness of the Le-Vel products and is essential to the company's ability to reach new customers.

---

[1] Gerald Albaum & Robert A. Peterson, *Multilevel (Network) Marketing: An Objective View*, 11 MARKETING R. 347, 347–61 (2011).

7.    As Le-Vel itself has articulated, "Le-Vel ships product directly to the end consumer as opposed to utilizing a reselling model,"[2] and "markets its products exclusively through its authorized Independent Brand Promoters."[3] Le-Vel sales to retail customers are done directly through Le-Vel Brand Promoter's "Replicated Websites."[4] These "Replicated Websites" display the same Le-Vel website as normally shown, but their web address contains a unique identifier, or the Brand Promoter's handle. Brand Promoters cannot edit the content, text, photos, prices, or any aspect of the Replicated Website, which only serves to give them credit for sales.

8.    Le-Vel strictly controls the work product of its Brand Promoters, in part by ensuring that they follow its rigid guidelines for marketing content and recruiting materials. In recent years, Le-Vel's direction and control of its Brand Promoters work product has become all-encompassing. Le-Vel developed strict marketing guidelines partially in response to being subjected to intense media scrutiny after it surfaced that that the company had tacitly encouraged its Brand Promoters to make false and dangerous claims health claims that Le-Vel offerings could hinder the transmissibility and/or severity of COVID.[5]

9.    Plaintiff was a victim of Le-Vel's practices. Like all Brand Promoters, in accordance with Le-Vel's strict marketing and sales protocols, Plaintiff was trained by other Brand Promoters and through Le-Vel materials, and was required to market, distribute, and sell Products to the public in accordance with Le-Vel's instructions and parameters. And in return, Plaintiff was paid virtually nothing, while incurring unreimbursed personal costs to perform the work on Le-Vel's behalf.

---

[2] The Direct Selling Self-Regulatory Council, *Case #24-2020 -NGO Inquiry- Le-Vel Brands LLC, BBB National Programs, Inc.* (Aug. 31, 2020), https://bbbprograms.org/programs/advertising/dssrc/cases/case-24-2020-ngo-inquiry-le-vel-brands-llc.

[3] *Le-Vel Brands Promoter Agreement*: *Policies and Procedures*, LE-VEL (Jan. 20, 2020), https://docs.google.com/document/d/1XidHz6wmhGISnk97UtkdemItBm1sTvaUq3WZD9rdqss/edit?usp=sharing, at § 1.

[4] *Id*., § 4.12

[5] *See* The Direct Selling Self-Regulatory Council, *Case #24-2020 -NGO Inquiry- Le-Vel Brands LLC, BBB National Programs, Inc.* (Aug. 31, 2020), https://bbbprograms.org/programs/advertising/dssrc/cases/case-24-2020-ngo-inquiry-le-vel-brands-llc.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

10.     For these reasons, Plaintiff brings this action to recover unpaid wages, overtime compensation, penalties, interest, injunctive relief, other equitable remedies, damages, and reasonable attorneys' fees and costs under the California Labor Code, Cal. Lab. Code §§ 201, 202, 203, 204, 226(a), 226.7, 226.8, 510, 512(a), 1174(d), 1194, 1197, 1197.1, 1198, 2800, 2802 and 2698 *et seq.* (the "CLC"), IWC Wage Order 4-2001 (8 Cal. Code Regs. § 11040), and California Unfair Competition Law (Cal. Bus. & Prof Code §§ 17200 *et seq.*). In addition, Le-Vel's conduct violates various municipal and county codes in California, including but not limited to City of Los Angeles Municipal Code Art. 7; County of Los Angeles Code § 8.100.040, *et seq.*, San Francisco Cal. Code 12R.

11.     Upon information and belief, Le-Vel has not addressed and/or changed its unlawful practices including failing to provide complaint meal and rest periods and has continued to deprive employees of money owed to them in straight and overtime compensation. By bringing this action, Plaintiff intends to stop this ongoing and unlawful practice and recover back wages and overtime to which she is rightfully entitled.

## II.   <u>JURISDICTION AND VENUE</u>

12.     The monetary damages, civil penalties, restitution, and equitable relief sought by Plaintiff, the class members, and other aggrieved employees exceed the minimal jurisdiction limits of the Superior Court and will be established according to proof at trial.

13.     This Court has jurisdiction over this action pursuant to the California Constitution, Article VI, section 10. The statutes under which this action is brought do not specify any other basis for jurisdiction.

14.     This Court has jurisdiction over all Defendants because, upon information and belief, Defendants are citizens of California, have sufficient minimum contacts in California, or otherwise intentionally avail themselves of the California market so as to render the exercise of jurisdiction over them by California courts consistent with traditional notions of fair play and substantial justice. Moreover, the acts and omissions detailed herein occurred in California.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

15.    Venue is proper in this Court because Plaintiff performed work for Defendants from her home in Union City, California: within Alameda County. Defendants' acts and omissions in violation of the relevant labor statutes are thus physically tied to Plaintiff's residential address.

16.    Upon information and belief, Defendants direct and control a large workforce of "Brand Promoters" throughout California, including in Alameda County, and have agents, employ individuals, and/or transact business in the State of California, County of Alameda.

## III.    THE PARTIES

17.    Plaintiff Jenavie Cahilig is an individual and resident of Union City, California.

18.    Le-Vel International, LLC is an entity incorporated under the laws of the State of Texas, with principal places of business in Frisco, Texas.

19.    Plaintiff is informed and believes and based thereon alleges that Jason Camper is, and at all times relevant hereto was, an individual residing in Scottsdale, Arizona, as well as Chief Executive Officer of Le-Vel. Plaintiff is further informed and believes and based thereon alleges that Jason Camper, in his capacity as the Chief Executive Officer of Le-Vel, exercised control over the wages, hours and/or working conditions of Plaintiff and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced California Labor Code provisions in violation of §§ 558.1, 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

20.    Plaintiff is informed and believes and based thereon alleges that Sophary Ly is, and at all times relevant hereto was, an individual residing in Denton, Texas, as well as Vice President and Chief Financial Officer of Le-Vel. Plaintiff is further informed and believes and based thereon alleges that Sophary Ly, in her capacity as the Vice President and Chief Financial Officer of Le-Vel, exercised control over the wages, hours and/or working conditions of Plaintiff and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced California Labor Code provisions in violation of §§ 558.1, 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

21.     Plaintiff is informed and believes and based thereon alleges that Cliff Gallagher is, and at all times relevant hereto was, an individual residing in Frisco, Texas, as well as Vice President of Operations and Field Integration of Le-Vel. Plaintiff is further informed and believes and based thereon alleges that Cliff Gallagher, in his capacity as the Vice President of Operations and Field Integration of Le-Vel, exercised control over the wages, hours and/or working conditions of Plaintiff and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced California Labor Code provisions in violation of §§ 558.1, 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

22.     Plaintiff is informed and believes and based thereon alleges that Jayson Jorgensen is, and at all times relevant hereto was, an individual residing in Provo, Utah, as well as Vice President of Strategy and Growth of Le-Vel. Plaintiff is further informed and believes and based thereon alleges that Jayson Jorgensen, in his capacity as the Vice President of Strategy and Growth of Le-Vel, exercised control over the wages, hours and/or working conditions of Plaintiff and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced California Labor Code provisions in violation of §§ 558.1, 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

23.     Plaintiff is informed and believes and based thereon alleges that Shelley Hill is, and at all times relevant hereto was, an individual residing in Rockwall, Texas, as well as Vice President of Human Resources and Corporate Development of Le-Vel. Plaintiff is further informed and believes and based thereon alleges that Shelley Hill, in her capacity as the Vice President of Human Resources and Corporate Development of Le-Vel, exercised control over the wages, hours and/or working conditions of Plaintiff and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced California Labor Code provisions in violation of §§ 558.1, 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

24.     Plaintiff is informed and believes and based thereon alleges that Shannon Schmidt is, and at all times relevant hereto was, an individual residing in Rockwall, Texas, as well as Director of Compliance of Le-Vel. Plaintiff is further informed and believes and based thereon alleges that Shannon Schmidt, in her capacity as the Director of Compliance of Le-Vel, exercised control over the wages, hours and/or working conditions of Plaintiff and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced California Labor Code provisions in violation of §§ 558.1, 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

25.     Plaintiff is informed and believes and based thereon alleges that Chante' Markus is, and at all times relevant hereto was, an individual residing in Ruskin, Florida, as well as Director of Social Media and Marketing of Le-Vel. Plaintiff is further informed and believes and based thereon alleges that Chante' Markus, in her capacity as the Director of Social Media and Marketing of Le-Vel, exercised control over the wages, hours and/or working conditions of Plaintiff and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced California Labor Code provisions in violation of §§ 558.1, 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

26.     The true names and capacities of Defendants sued as DOES 1–50, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names pursuant to California Code of Civil Procedure § 474. Plaintiff will seek leave to amend this Demand when said true names and capacities have been ascertained.

/ / /

/ / /

/ / /

IV.    **FACTS COMMON TO ALL CLASS MEMBERS AND AGGRIEVED EMPLOYEES**

A.    **Le-Vel Is a Successful Multilevel Marketing Company That Is Dependent on its Brand Promoters to Engage in Social Media Marketing on Its Behalf**

27.    Le-Vel is a massively successful multi-level (network) marketing company that serves both US and international markets with its portfolio of nutritional health and wellness products.[6] Le-Vel was founded in 2012 by Jason Camper and Paul Gravette.[7] Le-Vel has operated fully virtually since its inception, unique amongst other multi-level marketing companies in that it is built fully upon cloud-based technology.[8] Le-Vel's website boasts that it has over 10 million customers world-wide.[9] Le-Vel has netted over $3 billion in lifetime sales.[10]

28.    Le-Vel's success stems from its dependence on a massive network of fully remote Brand Promoters. The organization's multi-level marketing, or "network marketing" or "direct sales," structure is the sole reason for Le-Vel's continued profitability.

29.    But Le-Vel has for over twelve years exploited its California salesforce of Brand Promoters by misclassifying these Brand Promoters as independent contractors rather than as employees. In knowingly and willfully misclassifying these employees, Le-Vel has been able to mine free marketing and sales support from their Brand Promoters. The cost of sales and marketing that Le-Vel has thus far offloaded on its Brand Promoters is highly valuable, potentially worth millions.

30.    This is particularly egregious as Le-Vel's workforce is primarily comprised of marginalized and financially insecure individuals. Le-Vel targets and recruits women who are often shut out of traditional workplaces, such as those with criminal records, women who were raised in or who are active in certain religious communities, women with childcare responsibilities, and

---

[6] *Le-Vel Celebrates Most Successful Year In Company History*, PR NEWSWIRE (Mar. 2, 2018), https://www.prnewswire.com/news-releases/le-vel-celebrates-most-successful-year-in-company-history-300607538.html.
[7] *Id.*
[8] *Id.*
[9] *About*, THRIVE BY LE-VEL, https://thelvlife.le-vel.com/about (last accessed Apr. 21, 2025),
[10] *Le-Vel Unveils Revolutionary 4-Part GLP-1 Nutraceutical System*, PR NEWSWIRE (Dec. 10, 2024), https://www.prnewswire.com/news-releases/le-vel-unveils-revolutionary-4-part-glp-1-nutraceutical-system-302326735.html.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

military wives.[11] Due to their alienation from traditional workplaces, those targeted by Le-Vel tend to be less familiar with their labor protections and with employment law generally. Unfortunately, these women, already stretched thin energetically and financially, are less well-positioned to understand their rights as workers, less likely to identify when their protections are violated, and less able to seek recourse when such violations occur.

31.    Over the last decade, Le-Vel sales have moved from in-person to primarily online. This means that the lion share of Le-Vel product sales would not be exempt under the AB 5 "direct sales" exemption, California's Unemployment Code § 650. A confluence of factors precipitated the shift of sales to the virtual realm. First and foremost, social media sites such as Facebook, X (Twitter), Instagram, and TikTok have evolved into powerful marketing tools, and the adoption of these social media are now ubiquitous in the direct sales of Le-Vel products. Social media platforms are now the predominant way MLM sellers connect with both their potential clients and their community of sellers.[12] In as early as 2019, nearly half of all Americans indicated being "inundated" by social media connections who flooded their "feeds" with posts attempting to sell MLM-affiliated products.[13] Where once direct sales required Brand Promoters to walk door-to-door or host "Tupperware parties," now all Brand Promoters have to do is "post their products on social media to capture the attention of hundreds or thousands of people at once."[14]

32.    Secondly, COVID and associated lockdowns halted the ability of Brand Promoters to perform in-person sales, while also accelerating the widespread adoption of video chatting software like Zoom among their potential customer bases. This led Brand Promoters who had not yet already adapted to fully-remote sales to do so in order to adhere to lockdown policy. And since the initial

---

[11] "The vast majority of people who join multi-level marketing companies do not earn a profit. Those people [] also tend to be women who seek additional income to support a family or to find community." Annie Blackman, *Regulating The Reluctant: Policies That Benefit Vulnerable Participants In Multi-Level Marketing*, 25 U. PA. J.L. & SOC. CHANGE 83, 83 (2021); *see generally* Krista Marie Federico, Dissertation, *She Works Hard for No Money: Understanding Women's Participation in Multi-Level Marketing Organizations,* U. ARIZ. SCH. SOCIO. (2020).

[12] Lindsay R. Maher, *Note: Americon Dream: Social Pressures and Lackluster Regulation Allow Multi-Level Marketing Companies to Function as De Facto Pyramid Schemes*, 108 MINN. L. REV. 1587, 1622 (2024).

[13] Erika Giovanetti, *MLM Consultants Pressure Friends and Family to Overspend, and It's Straining Relationships*, LENDINGTREE, Dec. 16, 2019, https://www.lendingtree.com/debt-consolidation/survey-mlm-consultants-pressure-spending/.

[14] *Id.*

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

draw for many Brand Promoters was Le-Vel's promise of flexible, autonomous work, it can be inferred that the flexibility that comes with online sales means that there will be no future significant, de-transition to in-person sales by Brand Promoters.

33.     While some MLMs rely on home parties, door-to-door sales calls, and other forms of in person selling, Le-Vel's model is designed so that Brand Promoters can work online to solicit leads and recruit new Brand Promoters. Le-Vel acknowledges that it "ships product directly to the end consumer as opposed to utilizing a reselling model,"[15] and "markets its products exclusively through its authorized Independent Brand Promoters."[16] Since its inception, Le-Vel's workforce of Brand Promoters has been entirely remote, and thus it relies on its Brand Promoters to facilitate each of their sales online.

34.     Despite the pivotal role of its salesforce, Le-Vel has never properly classified Brand Promoters as employees. Rather, Le-Vel adheres to a multi-level (network) marketing organization structure, in which it offers people the purported "opportunity" to develop their own business earning commission by selling Le-Vel products and recruiting others to do the same, designating them as "independent contractors."

35.     However, these Brand Promoters are not independent contractors under applicable law. Le-Vel instead chose to unlawfully secure an expansive marketing and sales network for minimal to no cost. It has reaped enormous profits by deliberately avoiding paying wages and benefits to those performing the sales work that forms the backbone of Le-Vel's business. Le-Vel charges its Brand Promoters for access to the instrumentalities needed to sell products, further increasing its profits and decreasing Brand Promoters' pay, in violation of California law. The intended result is for Brand Promoters to receive, at most, de minimis profit from their work, while providing free labor and shouldering the costs of doing business that Le-Vel should be bearing.

---

[15] The Direct Selling Self-Regulatory Council, *Case #24-2020 -NGO Inquiry- Le-Vel Brands LLC, BBB National Programs, Inc.* (Aug. 31, 2020), https://bbbprograms.org/programs/advertising/dssrc/cases/case-24-2020-ngo-inquiry-le-vel-brands-llc.

[16] *Le-Vel Brands Promoter Agreement: Policies and Procedures*, LE-VEL (Jan. 20, 2020), https://docs.google.com/document/d/1XidHz6wmhGISnk97UtkdemItBm1sTvaUq3WZD9rdqss/edit?usp=sharing, at § 1.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

**B.      Le-Vel Brand Promoters Are Employees**

**1.      Controlling Law**

36.     Companies like Le-Vel were never supposed to be allowed to run an entire business on the backs of independent contractors. People who work in a company's core line of business are its "employees." *United States v. Silk*, 331 U.S. 704, 718 (1947).

37.     Le-Vel claims an unprecedented portion of its workforce as "independent contractors." Though Le-Vel has not recently publicly disclosed the size of its workforce, in 2017 there were between 750,000 and 850,000 Brand Promoters.[17] According to its LinkedIn, Le-Vel has approximately 10,000 employees.[18] Assuming that the number of Le-Vel brand promoters is roughly 800,000, this means that Le-Vel claims at least 99.9875% of its workforce as "independent contractors." Overtime, the proportion of workers that Le-Vel considers Brand Promoters has likely fluctuated – the true proportion will be confirmed should this matter proceed to discovery.

38.     Le-Vel employees perform a variety of roles: some work as software engineers, marketing assistants, and others as human resource managers. These workers receive special treatment from Le-Vel, receiving benefits that Brand Promoters do not, including but not limited to health insurance.

39.     But Brand Promoters, who make up the bulk of Le-Vel's workforce, are denied even the most basic protections of federal and state labor laws. Le-Vel does not pay them minimum wage; it does not pay overtime; and it does not reimburse business expenses, such as internet connections, laptops, smart phones, or post promotion over Facebook, YouTube, and Instagram. Its classification of its Brand Promoters also deprives them of basic protections against discrimination and sexual harassment.

---

[17] Le-Vel disclosed on September 17, 2017 that it had 750,000 active Brand Promoters, whereas just a month later, on October 17, 2017 it disclosed that it had over 850,000 active Brand promoters. 800,000 is being used as an estimate, but the true number has likely fluctuated since then. *See Le-Vel THRIVE Celebrates 5 Years of Multi-Level-Marketing Success*, Accesswire (Sept. 29, 2017), https://www.accessnewswire.com/newsroom/en/food-and-beverage-products/le-vel-thrive-celebrates-5-years-of-multi-level-marketing-success-476622 ("750,000"); *New Le-Vel THRIVE Docuseries Showcases Top Earning Thrivers*, ACCESS Newswire (October 17, 2017), https://finance.yahoo.com/news/le-vel-thrive-docuseries-showcases-143000279.html ("over 850,000").

[18] Le-Vel, LinkedIn, https://www.linkedin.com/company/le-velbrands/ (last accessed Apr. 21, 2025).

40.     By design, "independent contractors" are exempted from "nearly every" labor law, but this classification was not meant to be a loophole for companies like Le-Vel, whose Brand Promoters are effectively modern day telemarketers.[19] "Historically, firms reserved the independent contractor designation for entrepreneurial individuals whose skills demanded higher pay in the open market."[20] With this in mind, "[l]egislatures rationalized excluding [independent contractors] from most employment laws because these individuals did not require the same legal protections as potentially more vulnerable, less-skilled 'employees.'"[21]

41.     Today, Le-Vel preys upon many of the most vulnerable members of our society. Despite being a $40 billion industry, "the vast majority of people involved in them don't make money off of MLMs, and many people lose money."[22] Le-Vel's Brand Promoters are no exception: Though Le-Vel does not publish an income disclosure statement or data concerning its Brand Promoters' earnings, discovery will likely reveal that the majority of Le-Vel Brand Promoters receive no commission annually, and that a higher proportion still fails to even break even.

42.     MLMs like Le-Vel have grown during the COVID-19 pandemic, recruiting salespeople by promising remote work for the unemployed.[23] These are the precise individuals that legislatures meant to shield with minimum wage and other workplace protections.

43.     In recent years, state legislatures have taken action to send a clear message that most workers should be "employees."

44.     California has adopted the "ABC Test" to determine whether a company, like Le-Vel, has misclassified its workers as "independent contractors." Because employee status was meant to be the default, the ABC Test "presumptively considers all workers to be employees and permits

---

[19] Keith Cunningham-Parmeter, *From Amazon to Uber: Defining Employment in the Modern Economy*, 96 B.U. L. REV. 1673, 1683–84 (2016).
[20] *Id.*
[21] *Id.*
[22] Emily Stewart, *$5 Jewelry And An MLM Conference Gone Wrong: Multilevel Marketing Companies Were the "Perfect" Pandemic Business*, VOX (Sept. 23, 2021), https://www.vox.com/the-goods/22688317/mlm-covid-19-pandemic-recruiting-sales-paparazzi (citing study finding that 99 percent of MLM participants lose money).
[23] Abby Vesoulis & Eliana Dockterman, *Pandemic Schemes: How Multilevel Marketing Distributors Are Using the Internet—and the Coronavirus—to Grow Their Businesses*, TIME, Jul. 9, 2020, https://time.com/5864712/multilevel-marketing-schemes-coronavirus/.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

workers to be classified as independent contractors only if the hiring business demonstrates that the worker in question satisfies *each* of three conditions:

> A.  that the worker is free from the control and direction of the hirer in connection with the performance of the work… ***and***
>
> B.  that the worker performs work that is outside the usual course of the hiring entity's business; ***and***
>
> C.  that the worker is customarily engaged in an independently established … business of the same nature as that involved in the work performed."

*Dynamex Operations West, Inc. v. Superior Court*, 4 Cal.5th 903, 956–57 (2018) (emphasis in original).

### 2.    Brand Promoters Are Not Free from Le-Vel's Control

45.    To engage in online marketing work for Le-Vel, the company does not require Brand Promoters to hold any special experience, skills, license, or education level. Rather, Le-Vel requires only that a prospective Brand Promoter sign-up by filling out the "Le-Vel Free Promoter Enrollment" webform.[24]

46.    All Brand Promoters are then required to adhere to Le-Vel's many policies, codified in a document entitled "Promoter Agreement: Policies and Procedures" (the "Agreement"), which Le-Vel periodically updates, though the Brand Promoters' duties and responsibilities remained materially similar throughout the relevant statutory period. An example of the Agreement is attached hereto as **Exhibit A** and provides that Brand Promoters are to be considered independent contractors. Agreement, §2.1.

47.    The Agreement is 39 pages long and sets out most of the requirements of the Brand Promoters, including compliance with the "Code of Ethics," §1.1, requiring Brand Promoters to promise to market Le-Vel and engage in customer service in accordance with Le-Vel directives. The document contains the various instructions and policies that Le-Vel often communicates

---

[24] *Le-Vel Free Promoter Enrollment,* Le-Vel Cloud Control, https://cloudoffice.le-vel.com/Enroll, https://cloudoffice.le-vel.com/Enroll?Sponsor=405810&lng=en (last accessed Apr. 21, 2025).

verbally and through more informal materials, but nevertheless requires Brand Promoters to follow when marketing Le-Vel and engaging in customer service on behalf of Le-Vel.

48.     Because Le-Vel treats the Brand Promoters as independent contractors, it does not pay them any salary, wages, or benefits. Rather, as is typical in the MLM industry, the Le-Vel Compensation Plan provides for two types of compensation: (1) for sales the Brand Promoter made to consumers, the Brand Promoter receives a small percentage as a commission, and (2) if the Brand Promoter builds a "downline," i.e., recruits other new Brand Promoters to market and sell Le-Vel products and recruit more Brand Promoters, then the "upline" Brand Promoter receives commissions for sales made by those Brand Promoters in their downline.[25] Le-Vel also offers special "bonuses" to those Brand Promoters who hit certain sales and recruiting metrics in various time frames.

49.     Brand Promoters are responsible for all expenses. For instance, Brand Promoters do not receive products for free or even at a discount but must purchase them at customer price from Le-Vel to create promotional posts and testimonials on social media or to distribute samples. Le-Vel does not reimburse Brand Promoters for these purchases, nor for the costs of a cell phone, internet, and other routine business expenses such as photo editing software subscriptions or paid marketing tools, *inter alia*. Agreement, § 1.1(i) ("I understand and agree that I am solely responsible for all financial and/or legal obligations I incur in the course of my business as a Promoter.").

50.     In the Agreement, Le-Vel gives itself broad rights to control Brand Promoters and mandate conformance with its directives.

51.     Le-Vel's reliance on an e-commerce platform limits Brand Promoters' discretion and promotes online sales over in-person interactions. Brand Promoters' Le-Vel-issued websites, "Replicated Websites," are designed in a way that ensures that Brand Promoters operate in compliance with Le-Vel's marketing directives as laid out in its Agreement. Because the Replicated

---

[25] The "upline" and downline" concepts are the hallmark of the MLM structure. To illustrate, when an established Brand Promoter, whom we will call "Amy," recruits a friend, whom we will call "Bill," to be a Brand Promoter, Bill is in Amy's downline; and Amy is in Bill's upline. If Bill in turn recruits a new Brand Promoter, whom we will call "Chris," then Bill has an upline (to Amy) and a downline (to Chris); the established Brand Promoter Amy now has two levels to her downline, to Bill (first level), and Chris (second level). Should Chris then recruit someone, the established Brand Promoter Amy would have three levels to her downline.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Website is not a standalone website, but a portal by which the public can view the products on Le-Vel's own website in a way that gives credit to the Brand Promoter for the sale, the product pages and descriptions are generated entirely and solely by Le-Vel, with no option for the Brand Promoter to revise or supplement either the language or photos of the products. Thus, the Brand Promoter is in effect selling products using only Le-Vel-approved marketing language and intellectual property, as required by the Agreement.

52.    Le-Vel sets the prices online and does not permit adjustments, nor is there a way for a Brand Promoter to allow a customer to get a discount, receive a free gift, make a donation, or use any other offer that is not available on Le-Vel's main platforms and to all Le-Vel customers. This significantly limits Brand Promoters' marketing discretion.

53.    Le-Vel also restricts Brand Promoters from using any platform other than Le-Vel's website to make online sales; in other words, they cannot sell the products directly to consumers on Facebook Marketplace, eBay, Amazon, or similar sites. Agreement, §4.17. By making the Replicated Websites available and performing the back-end work, Brand Promoters would be less likely to seek out other e-commerce platforms to sell the products even if they were permitted.

### 3.    Brand Promoters' Work Is Not Outside Le-Vel's "Usual Course of Business"

54.    Le-Vel views the work of the Brand Promoters to market the products online as central to its business model. The primary benefit to Le-Vel from the Brand Promoters' work is the way in which they drive people to Le-Vel's website and fuel engagement with the brand. Le-Vel gets increased visibility on social media, enabling it to compete in a saturated health and wellness market more cheaply. For much the same reason that brands turn to influencers, Le-Vel understands that social media posts from friends may be more persuasive in driving interest and generating paying customers than a paid advertisement.

### 4.    Le-Vel Cannot Meet Its Burden To Show That Brand Promoters Are "Customarily Engaged" in a Separate Business

55.    Le-Vel cannot meet its burden to show that Brand Promoters are "customarily engaged" in an independently established sales and marketing business. Instead, most Brand

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Promoters are recruited regardless of their skill or experience, only perform sales and marketing for Le-Vel (using Le-Vel's approved platforms), and maintain no separate sales or marketing business.

56.    Brand Promoters are not required to have any background in sales, marketing, or nutrition prior to becoming a Brand Promoter. Brand Promoters are not required to have any licensure or meet any educational requirements, either. For example, they do not need to be licensed nutritionists, nor have any schooling, training, or prior employment in fields relating to health and fitness, or nutrition. Nor does Le-Vel require that they have schooling, training, or prior employment in marketing, sales, or general business. Instead, Le-Vel only requires that a prospective Brand Promoter complete a short application asking for basic personal information and sign the Agreement. In fact, most Brand Promoters have little to no prior relevant experience or training.

57.    Most Brand Promoters have never owned or operated their own separate sales business outside of Le-Vel. And most Brand Promoters do not maintain any registered or incorporated sales or marketing business, for their work with Le-Vel or otherwise. Brand Promoters generally do not hold themselves out to others as sales or marketing professionals or maintain any office or business address.

58.    Rather than rely on Brand Promoters' own business acumen or sales experience to market products, Le-Vel provides the instrumentalities of Brand Promoters' sales and marketing work. These include the "Back Office" (a password-protected website which includes a tool for Brand Promoters to send emails to customers and their downline Brand Promoters, as well as a gallery of approved images and video clips), the Replicated Website (the content of which is provided by Le-Vel and does not allow deviation from the standard template), the Le-Vel app, and Le-Vel scripts and graphics for use in marketing.

59.    Ultimately, Le-Vel intends for Brand Promoters to see Le-Vel as an employer, not as client. In other words, regardless of whether a Brand Promoter maintains any kind of independent business, Le-Vel's policies and mandated instrumentalities of work make it so the Brand Promoter responsibilities are not those that are of the sort that would be performed by an independent and trained professional. For example, Le-Vel prohibits Brand Promoters from "advertis[ing] or promot[ing] their Promotership or Le-Vel's business, products, or marketing plan, or us[ing] Le-

Vel's name in any electronic media or transmission, including on the Internet via websites, blogs, splash pages, landing pages, email opt-in pages or otherwise" unless Le-Vel expressly authorizes Brand Promoters to do so." Agreement, § 4.10. The expectation is that Le-Vel can strictly control all of its marketing and positioning, even where done by Brand Promoters. Likewise, Le-Vel's policies promoting sales through the Replicated Websites, restrictions on using other websites as a point of sale, and limitations on where the products can physically be sold effectively prevent Brand Promoters from integrating the sale of Le-Vel products into any pre-existing business. And Le-Vel prohibits Brand Promoters from using its platforms to promote other businesses, including any other multi-level marketing companies.

60. Similarly, those experienced in social media marketing are not allowed to use the kinds of tools relied upon by professionals in the field; Le-Vel forbids Brand Promoters from creating or using their own graphics without explicit approval from Le-Vel. People with digital marketing experience cannot leverage their skills because Le-Vel does not provide access to data collected from visitors to Brand Promoters' Replicated Website, nor the ability to track them and target ads to them. Instead, Le-Vel designs the overall social media advertising campaign, and supplies the Brand Promoters with hashtags, scripts, promotional photos and video clips, and other strategic advertising directives for the Brand Promoters to use to sell Le-Vel's products on social media.

61. Further, Le-Vel actively limits Brand Promoters' ability to engage in sales or marketing opportunities outside Le-Vel. For example, Le-Vel prohibits Brand Promoters from recruiting other Brand Promoters to join other MLMs or even to market other MLM products to fellow Brand Promoters.

**5.    Le-Vel Brand Promoters Are Not "Direct Sellers."**

62. Despite classifying the Brand Promoters as Independent Contractors, they are employees under California law. As set forth below, while some MLM workers might meet the narrow statutory exemption for those employed in "direct sales," Brand Promoters do not.

/ / /

/ / /

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

i.     _Background on MLMs and the Direct Sales Exemption._

63.     For many years, the MLM industry has enjoyed notoriety for its ability to carve out loopholes from federal and state employment laws, permitting MLMs to treat its sales personnel as independent contractors. These regulations were enacted in the 1970s and 1980s, and in California, the exemption describes a different job than what Brand Promoters perform.

64.     When AB 5 was passed in 2019, it codified the opinion in _Dynamex Operations West, Inc. v. Superior Court of Los Angeles County_, 4 Cal. 5th 903 (2018), in which it set forth a new test for misclassification (the "Dynamex Test"). When the bill was being debated, many in the MLM industry recognized that the Dynamex Test would require them to classify their workers as employees. The Direct Selling Association ("DSA"), the industry lobbying group, pushed for an exemption. As a result of those efforts, AB 5 exempts from the Dynamex Test any salesperson "described in Section 650 of the Unemployment Insurance Code, so long as the conditions for exclusion from employment under that section are met." ("Direct Sales Exemption") For such workers who fall within the exemption, the old common law test (rather than the ABC Test) would govern the question of employee status.

65.     For an entity to be covered under the Direct Sales Exemption, the hiring entity must show that the work satisfies all three criteria set forth in the statute, namely that (a) the worker performs one of two specific types of work; (b) the worker's compensation is directly tied to sales or output, and not hours worked; and (c) the worker and business have an agreement that the worker will be treated as a contractor for tax purposes. If all three criteria are not met, then the exemption does not apply, and if the worker otherwise meets the Dynamex Test, they are misclassified. While the third of these criteria—services performed pursuant to a contract identifying the person as an independent contractor—is only facially met, and even if it were an enforceable contract, that factor is not dispositive. As discussed below, the Brand Promoter job does not satisfy the other criteria.

ii.     _Le-Vel Brand Promoters Do Not Perform the Jobs Identified in the Direct Sales Exemption._

66.     First, for the Direct Sales Exemption to apply, the salesperson must be performing one of two narrowly defined jobs. Specifically, the Exemption requires that one be "engaged in the

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

trade or business of primarily inperson [sic] demonstration and sales presentation of consumer products, including services or other intangibles, in the home or sales to any buyer on a buy-sell basis, a deposit-commission basis, or any similar basis, for resale by the buyer or any other person in the home or otherwise than from a retail or wholesale establishment." In other words, section (a) of the Direct Sales Exemption is best understood as identifying two specific categories of direct sales jobs, **_Primarily In Person Consumer Sales Work_**, and **_Wholesale/Resale Work_**, that could trigger the applicability of the Direct Sales Exemptions. The Brand Promoter does not fall under either of these categories.

67.    **_Le-Vel Brand Promoters Are Not Engaged Primarily in In-Person Consumer Sales Work_**. This job category covers those who are "engaged in the trade or business of primarily inperson [sic] demonstration and sales presentation of consumer products, including services or other intangibles, in the home." Thus, the exemption is limited to those who are _primarily_ selling consumer products _in person_ and _in the home_. These terms are significant, as they do not appear in the analogous job category of "direct sellers" under a later federal statute. _See_ 26 U.S.C. § 3508(b)(2)(ii). Thus, the California exemption applies narrowly to jobs like door-to-door salespersons, or the direct sellers who work almost exclusively through the home party circuit, i.e., people who sell consumer products by meeting with other consumers in their homes.

68.    As discussed throughout, Brand Promoters do not "primarily" sell "in person." Moreover, to the extent any Brand Promoter in the Le-Vel network was primarily conducting "in person" sales after the purported Le-Vel "digitization" the COVID pandemic would have pushed more sales online.

69.    **_Le-Vel Brand Promoters are not engaged in Wholesale/Resale Work._** This job category, which also has a federal parallel, 26 U.S.C. § 3508(b)(2)(i), covers those are engaged in:

        a) "sales to any buyer"

        b) "on a buy-sell basis, a deposit-commission basis, or any similar basis,"

        c) "for resale by the buyer or any other person", and

        d) "in the home or otherwise than from a retail or wholesale establishment."

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

While California law does not define the terms buy-sell or deposit-commission in [b], federal law does. The term "buy-sell basis" is one in which one buys the product to sell the product, and gets paid for selling the product with the spread between the purchase price and the resale price, and term "deposit-commission basis" applies where the buyer keeps as commission for a sale of a product the deposit received from the buyer. *See* 26 U.S.C. 6041A(b)(2)(A) & (B).

70.    The "Wholesale/Resale Work" is even more narrow than "In Person Home Sales Work," and does not apply to Le-Vel. Rather, Le-Vel's Agreement requires that Brand Promoters sell only to themselves or to retail customers. Nowhere in the Agreement or in Le-Vel's public materials does it state that compensation is on a buy-sell or deposit-commission basis.

71.    To illustrate what is meant by "Wholesale/Resale Work," a hypothetical upline Brand Promoter Sue would be performing this work if [a] Sue was selling Le-Vel products to her downline Brand Promoter Bob [c] for Bob to resell, not to keep for his own use; and [b] Sue was compensating Bob for his resale services by permitting Bob to keep the difference between the price he paid to Sue and the product's selling price or by permitting Bob to keep the deposit he acquired. Brand Promoters do not work in this way, selling products to Brand Promoters for Brand Promoters to re-sell. If Bob directs a lead to his Replicated Website, and the lead purchases a product from Le-Vel, both he and his upline Brand Promoter (e.g., Sue) would receive a commission for sales from Le-Vel. But as to Sue, [a] is not met because Sue did not sell the products to Bob. Because Bob acquired the products from Le-Vel to sell at retail, not to someone to re-sell, [a] and [c] are not met. As to both, [b] is not met, because neither sold the product on those terms. Rather, Le-Vel takes the full payment at the point of sale and sends the product directly to the consumer, and then separately pays the Brand Promoter.

72.    ***The job descriptions in the Direct Sales Exemption predate significant changes to how MLMs now operate.*** By way of background, these two categories of jobs outlined in the Direct Sales Exemption were how MLMs organized at the time the Direct Sales Exemption was enacted. In the 1970s and 1980s, downline sellers hosted parties, traveled door to door, had booths at local fairs, or visited friends and family in their homes to hand out samples, catalogs, and sales sheets. They took orders and payment directly from the customer. Once the seller had enough orders, the

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

1   seller placed the order with the company, received the shipment from the company, and then met

2   with the customer again in person to deliver the product and if necessary, collect any further

3   payment that might be due. The direct seller engaged with consumers both directly and personally;

4   the consumers had little to no interaction with the company.

5       73.   In some instances, instead of placing the order with the company, the seller

6   performing "In Person Home Sales" would place the order with the person in their "upline," who

7   was engaged in "Wholesale/Resale Work." The upline seller acquired products from the company,

8   and sold them to the downline "In Person Home Sales" worker on a buy-sell or commission deposit

9   basis for them to sell to end consumers (or to their downlines). The seller was able to do

10  "Wholesale/Resale Work" because at the time, MLMs permitted direct sellers to fulfill their sales

11  quotas by either selling the product to retail consumers or selling it to downline sellers.

12      74.   Since the Direct Sales Exemption was enacted, various changes in the MLM industry

13  occurred to move away from this model. Most notably is the fact that over the last few decades,

14  MLMs have been forced to make changes to their operations in response to regulatory actions and

15  civil lawsuits by private litigants to enforce anti-pyramid scheme laws. Courts and regulators have

16  made clear that to avoid violating criminal and civil pyramid scheme laws, MLMs needed to conduct

17  operations so as to ensure that real, meaningful sales were happening directly to consumers—instead

18  of primarily to sellers' own downlines. *See, e.g.*, *Webster v. Omnitrition Int'l*, 79 F.3d 776, 782 (9th

19  Cir. 1996). It was not enough to simply have a policy that sales should be at retail; the law has

20  evolved so as to require MLMs to enforce that policy and to demonstrate its effectiveness at ensuring

21  participants were not merely stockpiling inventory and seeking to recoup losses by recruiting new

22  sellers to buy the product from them.

23      75.   These legal developments have prompted two important changes. First, because

24  MLMs must ensure retail sales are occurring, few if any MLMs permit sellers to perform

25  "Wholesale/Resale Work." Certainly, Le-Vel does not. Second, the work undertaken by MLMs to

26  enforce policies as to sales at retail results in them exercising far more control than they might have

27  decades ago.

28

76.    Furthermore, by implementing platforms such as the Replicated Website, Le-Vel can better oversee Brand Promoters in their work to ensure they are not engaging in activities that could run afoul of anti-pyramid scheme laws. Le-Vel can oversee all retail sales, given the vast majority occur on its website and on public social media pages. While this control may protect Brand Promoters from being a victim of one kind of legal violation, they also remove much of the discretion that other independent MLM contractors had.

iii.    *Le-Vel's Modern E-Commerce Business Is Unlike Past and Present Direct Sales Companies.*

77.    The Direct Sales Exemption and its inclusion in AB 5 was based on the MLM industry's claim that it is needed to ensure the industry can continue to offer people the opportunity to create and run their own businesses. Some MLM businesses do run operations that are predominately based around in-person sales, promoting home parties and sales at community events, like Parent Teacher Association meetings or similar. Some do not allow consumers to buy products via a company website or they use pricing and purchasing policies that give the seller more control. In the primarily face-to-face, in-person sales context, the direct line between a person's effort and a closed sale may still be one that can be drawn and may allow for the kind of independent business operations contemplated by the statute.

78.    Le-Vel's operations, however, are a stark departure. The way in which it operates its platforms, including the Replicated Websites, eliminates for the Brand Promoter nearly all the work associated with operating a business, as compared to MLMs of the past, and of some in the present. At the same time, by removing many of the functions performed by sellers in the past, Brand Promoters with expertise, skills, or a willingness to invest in certain areas are unlikely to realize a material change in their earnings prospects.

79.    For example, the use of Replicated Websites means that skills or investment in inventory management or distribution processes are not necessary, nor will they have a material impact on a Brand Promoter's outcome. When customers place orders on the Replicated Websites, Le-Vel fulfills them. Unlike some MLMs, both current and historic, as well as in the traditional

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

wholesale context, Brand Promoters do not need to plan to have products on hand or collect bulk orders.

80.    Similarly, expertise or support in accounting, finance, economics or pricing will not impact a Brand Promoter's outcome, because Brand Promoters are not able to alter prices at which the products are sold on their Replicated Websites and must sell them at the rate that Le-Vel has determined will cover Le-Vel's expenses, regardless of whether the Brand Promoter's compensation is enough to cover the Brand Promoter's expenses. Le-Vel calculates, collects, and remits sales taxes, and Brand Promoters do not need nor would benefit from experience in that area. Unlike some MLMs, both current and historic, as well as in the traditional wholesale context, Le-Vel does not give a larger discount or increase the percentage basis for a commission if a Brand Promoter orders a larger amount of products for their customers.

81.    Le-Vel also pays the Brand Promoter's upline and downline and determines any compensation owed to them, and thus, a Brand Promoter does not negotiate or set anyone else's rates of pay. Le-Vel handles the payment interface, and thus Brand Promoters do not need expertise in electronic payments, data security and privacy, credit card processing regulations, or similar.

### 6.    The Terms and Conditions in the Brand Promoter Agreement are Unconscionable, Unfair, and Unlawful.

82.    The Agreement between Le-Vel and Brand Promoters is a tool by Le-Vel to exert control while maximizing Le-Vel's profits. The Agreement is a take-it-or-leave it deal, with no opportunity for negotiation. And many Brand Promoters discover that the arrangement is one in which they will spend extraordinary amounts of time and money promoting the company with little payoff. [26] Indeed, the effect of the Agreement, when considered in tandem with Le-Vel's other business practices, grossly restricts Brand Promoters' ability to profit from their work advertising sales, and may cause Brand Promoters to turn attention to recruiting more Brand Promoters into a futile business endeavor.

---

[26] Abby Vesoulis & Eliana Dockterman, *Pandemic Schemes: How Multilevel Marketing Distributors Are Using the Internet—and the Coronavirus—to Grow Their Businesses*, TIME, Jul. 9, 2020, https://time.com/5864712/multilevel-marketing-schemes-coronavirus/.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

83.     Indeed, MLMs like Le-Vel have been criticized for the fact that few of the sellers manage to profit. At least one study concluded that 99% of MLM participants do not earn money;[27] another found that only 25% earned a profit.[28] Le-Vel's numbers are likely consistent with this low rate of success, though it has not released any income disclosure statements or information regarding the earnings of its Brand Promoters. This decision runs contrary to industry trends, as most major MLMs publicly issue such statements annually. Regardless, it can be inferred that because Brand Promoters rack up significant expenditures to position Le-Vel products, many fail to profit. As described throughout, Brand Promoters themselves foot the bill for event registration fees, Le-Vel-related travel, office supplies, insurance premiums, products purchased for business purposes, marketing materials, and internet and phone bills, inter alia.

84.     Moreover, Le-Vel has structured its business operations and Agreements to benefit from the addition of more Brand Promoters, while Brand Promoters lose. Le-Vel benefits when tens of thousands are active on social media but incurs no other expense unless the Brand Promoter generates a sale. While Le-Vel benefits from an oversaturation of Brand Promoters, the individual Brand Promoters only have more competitors and a harder time setting themselves apart. And nowhere in the Agreement does Le-Vel promise to limit the number of Brand Promoters retained in any way.

85.     Given that Brand Promoters must compete with Le-Vel and other Brand Promoters for retail sales under such oppressive and onerous terms, it is no surprise that the overwhelming majority never receive commission or struggle to break even. But because Brand Promoters receive commission from the retail sales made by any Brand Promoters they recruit, Le-Vel's own income disclosures indicate that those who advance to higher levels through recruiting more Brand Promoters on average earn more money. Thus, Brand Promoters have a financial incentive to advertise the opportunity to work with Le-Vel under these unfair, unconscionable, and oppressive terms. Those new Brand Promoters in turn will pay Le-Vel various fees discussed herein, buy merchandise from Le-Vel, promote Le-Vel on social media, be subject to the same restrictions on

---

[27] *Id.*

[28] *What is Multilevel Marketing (MLM)?*, AARP FOUNDATION, https://www.aarp.org/aarp-foundation/our-work/income/multilevel-marketing/ (last accessed Oct. 30, 2024).

selling as those who recruited them, and like those before them, find profiting from selling to be futile and turn to recruiting.

**C.    Le-Vel's Misclassification of Plaintiff and Brand Promoters Was Willful.**

86.    Le-Vel's decision to misclassify the Brand Promoters as independent contractors was willful and intentional.

87.    *First,* Le-Vel employs personnel in a variety of roles in California, and thus, it is implementing California's labor and employment laws as a matter of regular practice. It is a highly sophisticated, large company, whose legal team includes California lawyers, both those at the prestigious law firms that provide it representation in other matters, as well as those comprising its team of in-house counsel. Both its management and its legal team would be exposed to news about changes in California law with respect to misclassification.

88.    *Second,* as detailed above, Le-Vel's Agreement, as well as other materials and communications to Brand Promoters, set forth various rules and policies. Le-Vel knew and intended for Brand Promoters to conform to these rules and policies and ensured adherence through its own platforms and other instrumentalities.

89.    *Third,* Le-Vel knows and depends on the Brand Promoters and even the highest levels of the company understand that the Brand Promoters play an essential role in Le-Vel's growth and business model. The management team not only understands the essential role the Brand Promoters play, but know they are classified as independent contractors, as evidenced by their decision to operate the company as an MLM. Thus, the decision was not a singular decision by a low-level employee, but a conscious and knowing choice endorsed by the highest levels of Le-Vel's management.

90.    *Fourth,* Le-Vel further knows and understands as an MLM, few workers will make money under a commission structure, and repeatedly states in publicly accessible documents that its Brand Promoters only get paid if they make a sale, no matter how many hours they worked promoting Le-Vel. Indeed, the commission structure represents a significant cost savings over the payment of hourly wages. Le-Vel is aware that it is receiving inexpensive, commission-based work from its Brand Promoters—it intentionally structured the program in that way.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

91.    **Fifth,** Le-Vel knew that its Brand Promoters were not engaged in either type of work protected under the Direct Sales Exemption. It does not use terms like "buy-sell" or "deposit-commission" in its compensation documents or Agreement. It also knows that its Brand Promoters engage primarily in social media marketing on its behalf, and are rarely, if ever, engaging in person sales or hosting parties in others' homes, particularly during and since the COVID pandemic. And it designs platforms, such as the Promoter Cloud Office, Thrive Connect App, and Replicated Websites, to facilitate online sales and marketing.

92.    **Sixth,** Le-Vel knew the Direct Sales Exemption was enacted years ago, and there was no guarantee that all MLMs could enjoy its protection. Rather, Le-Vel has been an MLM since 2012 and thus, should have or did know that the classification of MLM workers has for years been one of the most critical legal and policy issues for the industry.

93.    For example, in 2018, the Oregon Supreme Court determined that an MLM had misclassified its sales personnel as independent contractors. *See ACN Opportunity, LLC v. Employment Department*, 362 Or. 824 (2018). The decision was based in part on the fact that the statute exempted sales "in the home," and the legislative history indicated that this exemption was narrowly tailored to apply to things like Tupperware parties. Notably, the concurrence made clear that the direct sales laws on the books reflect outdated direct selling practices and may not reach many modern MLMs. It is hard to imagine that Le-Vel would not have learned of a decision by a state supreme court, particularly given the decision's significance to its industry.

### D.    <u>Le-Vel's Misclassification of Brand Promoters and Unfair Business Practices Harm the California Public.</u>

94.    Le-Vel's misclassification of its workers and unfair and unconscionable business model threatens the general public. Because Le-Vel has no incentive to stop these practices, a public injunction is necessary to stop these practices.

/ / /

/ / /

/ / /

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

1. **Le-Vel Uses Widespread Advertising Practices Directed at the General Public to Recruit New Brand Promoters.**

95.    Le-Vel has eschewed traditional recruiting practices in lieu of widespread advertising. Because of how Le-Vel recruits, nearly everyone in the state of California is likely to be targeted for recruiting and engagement in Le-Vel's unfair and unlawful business model.

96.    Rather than market job opportunities to job seekers meeting certain criteria, Le-Vel uses its Brand Promoters to promote the Brand Promoter opportunities in the same way they advertise its products. Le-Vel has set up its compensation structure and business model to incentivize Brand Promoters to turn to recruiting, and those Brand Promoters in turn will promote the opportunity to their customers, as well as their family and friends. Thus, the public does not need to be affirmatively seeking out job opportunities; merely buying a routine consumer good or having a friend or family member working as a Brand Promoter may subject them to recruiting messaging, and by extension, could lead them to accept the Agreement and become a Brand Promoter.

97.    Moreover, Le-Vel's reliance on its existing Brand Promoter network to advertise the Independent Consulting opportunity is likely to cause the message to reach the general public at large, as its network is enormous. Indeed, Le-Vel reported in 2020 that over 1,000 new Brand Promoters enrolled *every week*. [29] While the MLM industry generally saw massive upticks in enrollment numbers during the COVID-19 pandemic, and numbers have declined since then, there are likely thousands still in California, and numbers could surge under another pandemic or major economic downturn.  Brand Promoters need not respect geographic boundaries when advertising the Brand Promoter opportunity, and thus, any member of the California public who either personally knows a Brand Promoter or follows one on social media, regardless of where the Brand Promoter lives, is likely to receive messages about the Brand Promoter opportunity.

---

[29] *See Case #24-2020 - NGO Inquiry - Le-Vel Brands LLC*, THE DIRECT SELLING SELF-REGULATORY COUNCIL (BBB NATIONAL PROGRAMS, INC.) (Sept. 8, 2020), https://bbbprograms.org/programs/advertising/dssrc/cases/case-24-2020-ngo-inquiry-le-vel-brands-llc.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

98.     Because of the financial incentives those Brand Promoters receive, members of the public may sometimes repeatedly and consistently receive advertising about the Brand Promoter opportunity over weeks or months at a time, and perhaps from multiple Brand Promoters. Indeed, each newly recruited Brand Promoter presents the risk of an exponential increase of Brand Promoters. Brand Promoters can maintain their status and receive additional compensation based on the sales volume of the downline Brand Promoters that they recruited. The more Brand Promoters recruited into their downline, the more likely it is that they will be able to generate more income.

99.     Because Brand Promoters are incentivized to aggressively recruit new Brand Promoters, and Le-Vel considers every customer to be a potential Brand Promoter, California's residents are vulnerable to long-term consequences of Le-Vel's rampant misclassification. Notably, Le-Vel is not a selective employer; it requires little in the way of experience or other criteria. The overwhelming majority of adults in the state of California are likely qualified for the job, and millions of people in the state may seek out this opportunity. Indeed, it is estimated that one in every thirteen Americans will participate in an MLM at some point in their lifetimes.[30] This could translate into hundreds of thousands of Californians, if not millions of Californians, who are at risk of being recruited into an illegal and unfair working arrangement.

**2.      Le-Vel's Unfair and Unlawful Conduct Harms California In Other Ways.**

100.    Beyond recruitment, Le-Vel's misclassification of their Brand Promoters harms Californians both economically and socially. When Brand Promoters lose money and accumulate credit card debt, they and their families are harmed by the siphoning away of their uncompensated time and lost money on business expenses. This results in them and their families having fewer resources to invest in legitimate businesses and less time to spend working for real, guaranteed wages. And instead of the opportunity being a "side hustle" that allows them to pay off mortgages or student loan debt, cover costs of childcare, or otherwise advance financially, the loss of money from Independent Consulting could cause them more economic hardship.

---

[30] Marguerite DeLiema, et al., *AARP Study of Multilevel Marketing: Profiling Participants and their Experiences in Direct Sales*, AARP FOUNDATION 13 (2018), https://www.aarp.org/content/dam/aarp/aarp_foundation/2018/pdf/AARP%20Foundation%20MLM%20Research%20Study%20Report%2010.8.18.pdf.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

101.   This public harm intensifies during periods of crisis. It is well-documented that MLMs, like Le-Vel, profited from greater recruitment of participants during the COVID-19 pandemic.[31] Le-Vel expects the same profit from future crises, such as financial recessions, because it recruits new Brand Promoters under the guise that they will be able to grow their own business with a sustainable income. Le-Vel siphons potential workers away from legitimate opportunities with the promises of building a personal business, when these individuals are under Le-Vel's control with none of the benefits of proper classification.

102.   Le-Vel's practices also harm competitors, such as legitimate companies in the health and wellness space, who must and do pay wages and benefits at prevailing market rates to market and sell their products. By misclassifying its workers, and paying them only for certain sales, Le-Vel incurs lower expenses, giving them a competitive advantage over other market participants.

103.   The California Legislature specifically considered harms like these in passing AB 5. The legislature recognized "harm to misclassified workers who lose significant workplace protections, the unfairness to employers who must compete with companies that misclassify, and the loss to the state of needed revenue from companies that use misclassification to avoid obligations such as payment of payroll taxes, payment of premiums for workers' compensation, Social Security, unemployment, and disability insurance" and that "the misclassification of workers as independent contractors has been a significant factor in the erosion of the middle class and the rise in income inequality." Le-Vel's continued misclassification of California workers will exacerbate all these harms to the California public.

104.   Absent an injunction protecting the public from the negative impacts of Defendants' illegal activities, including by and through their officers and/or entities in their control, the California public remains at risk from Le-Vel's deceptive recruitment strategies and the economic and social harms created by their unlawful practices.

/ / /

/ / /

---

[31] Abby Vesoulis & Eliana Dockterman, *Pandemic Schemes: How Multilevel Marketing Distributors Are Using the Internet—and the Coronavirus—to Grow Their Businesses*, TIME, Jul. 9, 2020, https://time.com/5864712/multilevel-marketing-schemes-coronavirus/.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

### E.    Plaintiff's Experiences as a Le-Vel Brand Promoter

105.    Plaintiff works for Le-Vel as a Brand Promoter, enrolling in or around September 2020.

106.    When she signed up, Le-Vel required Plaintiff to adhere to its many rules and policies, including those codified in the Le-Vel Brands Promoter Agreement, Le-Vel Terms, and the Le-Vel Compensation Plan. Plaintiff was not engaged in an independently established trade, occupation, or business as a sales professional and had limited sales experience.

107.    Around the time she signed up, Plaintiff filled out her profile on the Le-Vel Back Office. This included providing her social media information to Le-Vel, which they can access to monitor her compliance with the Agreement.

108.    Le-Vel also provided Plaintiff with a personalized Le-Vel website URL for her Replicated Website and a "Personalized Link," and instructed her to provide it to prospective customers.

109.    At no time has Plaintiff been instructed to focus on in-person sales. As a general matter, Plaintiff understands from communications, directives, and practices of Le-Vel that sales efforts are to be predominately online.

110.    As a Brand Promoter on behalf of Le-Vel, Plaintiff markets Le-Vel products on various social media platforms, predominantly relying on Instagram. To carry out this marketing work, Plaintiff performs the following tasks:

a)    Purchasing, studying, and testing Le-Vel products;

b)    Posting on Plaintiff's social media pages about Le-Vel products, including brainstorming content, drafting and editing text, and taking and editing photographs and video recordings for posts, as well as incorporating Le-Vel-approved messaging for many, if not all, of her posts;

c)    Developing and following up with Le-Vel sales leads;

d)    Regularly monitoring the Thrive Connect app as well as Plaintiff's social media pages to engage further with customers, and replying to any direct messages from interested customers;

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

e) Evaluating customers' needs, lifestyle, and goals to put together customized Le-Vel product bundles for her customers;

f) Participating in efforts to recruit, onboard, train, and/or mentor new Brand Promoters;

g) Attending meetings with upline and downline Brand Promoters; and

h) Tracking and reporting her progress and sales using Le-Vel products.

111.    Plaintiff has performed all these tasks regularly throughout her tenure, typically spending about fourteen hours a week, often working for periods of two hours per day. Plaintiff performed these activities throughout the day, nearly every day, often in short increments adding up to two hours a day.

112.    Plaintiff rarely, if ever, sold to customers in-person, and her advertising and messaging was done online.

113.    Plaintiff, like all Brand Promoters, worked under Le-Vel's pervasive control and direction. Selling Le-Vel products—the main responsibility of Brand Promoters—is work that is precisely in line with Le-Vel's usual course of business.

114.    Plaintiff paid the following fees and out-of-pocket, work-related expenses throughout her tenure, for which she was not reimbursed by Le-Vel:

a) A selection of 3 day packs which she could distribute to potential customers as samples;

b) An inventory of Le-Vel products that she could use in her promotional materials;

c) Non-Le-Vel-branded sales aids, promotional items, and sales technology;

d) Digital Marketing apps;

e) Photo and video editing software subscriptions;

f) Monthly bills for her cell phone and internet bills.

115.    During Plaintiff's tenure, Le-Vel determined the prices at which all products could be sold. She did not have the authority nor ability to sell or advertise prices for Le-Vel products at a different price. All sales by any customer that Plaintiff referred to Le-Vel were made through Le-Vel-controlled platforms.

116.   During Plaintiff's tenure, including during the last five years, Plaintiff has not been compensated for her time doing any of the forementioned activities.

117.   During Plaintiff's tenure, Plaintiff has regularly paid out of pocket for expenses related to her work for Le-Vel. Plaintiff has not been compensated for out-of-pocket expenses.

118.   Plaintiff's commissions are paid via direct deposit. No paystubs are provided that identify hours worked, nor have any employment taxes been withheld at any time.

## V.    CLASS ALLEGATIONS

119.   Plaintiff incorporates and realleges the above paragraphs.

120.   Plaintiff brings this action on her own behalf, as well as on behalf of each and all other persons similarly situated, and thus seeks class certification under California Code of Civil Procedure section 382.

121.   All claims alleged herein arise under California law for which Plaintiff seeks relief authorized by California law.

122.   Plaintiff's proposed class consists of and is defined as follows:

> All current and former Brand Promoters who resided in the State of California or who performed marketing or sales activities in California during the applicable statutes of limitations through the date a class is certified.

123.   Plaintiff also alleges the following subclass:

> The Above-Standard Minimum Wage Subclass

> All current and former Le-Vel Brand Promoters classified as independent contractors who resided in California cities or counties with a minimum wage rate greater than the California minimum wage during the applicable statutes of limitations through the date a class is certified. This subclass includes, but is not limited to, residents of Los Angeles (City and County), San Francisco, San Diego, Oakland, and San Jose.

124.   Members of the Class will hereinafter be referred to as "Class Members." Plaintiff reserves the right to redefine the Class and to add subclasses as appropriate based on further investigation, discovery, and specific theories of liability.

125.   ***Ascertainable and numerous.*** The Class is ascertainable and numerous such that joinder is impractical. The membership of the entire class is unknown to Plaintiff at this time.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

However, the class will likely consist of thousands of members, the precise number which is within the knowledge of and can be readily ascertained through Le-Vel's records.

126. ***Community of Interest.*** There is a well-defined community of interest amongst Class Members. A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because the Class is both numerous and its membership is geographically widespread across California. A class action will achieve economies of time, effort and expense as compared with separate lawsuits, and will avoid inconsistent outcomes because the same issues can be adjudicated in the same manner and at the same time for the entire class. In addition:

127. ***Predominating Common Questions.*** There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class. Among the questions of law and fact common to the Class are:

a) Whether Le-Vel misclassified its Brand Promoters as independent contractors when in fact they were Le-Vel employees;

b) Whether Le-Vel failed to pay Plaintiff and Class Members the legally mandated minimum wage for all hours worked;

c) Whether Le-Vel failed to pay Plaintiff and Class Members overtime wages;

d) Whether Le-Vel failed to timely pay wages due to Plaintiff and Class Members during their employment;

e) Whether any misclassification by Le-Vel was voluntary and knowing;

f) Whether Brand Promoters' duties fall within the Direct Sales Exemption to AB5;

g) Whether Le-Vel controlled the manner and means of the Brand Promoters' work;

h) Whether Le-Vel failed to reimburse Brand Promoters' business expenses;

i) Whether Le-Vel failed to maintain accurate time records for its Brand Promoters;

j) Whether Le-Vel failed to provide complete and accurate wage statements to its Brand Promoters;

k) Whether Le-Vel failed to pay Brand Promoters their wages due at termination; and

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

l) Whether Le-Vel should be enjoined from continuing the practices described herein.

128. **Typicality.** Plaintiff's claims are typical of the claims of Class Members because Plaintiff, like all members of the Class, worked as a Brand Promoter for Le-Vel in California, was required to adhere to Le-Vel's policies, and was paid on a commission basis. Furthermore, like all members of the Class, Plaintiff sustained damages from Le-Vel's wrongful conduct. Accordingly, Plaintiff has no interests antagonistic to the interests of any other member of the Class.

129. **Adequacy.** Plaintiff will fully and adequately assert and protect the interests of the Class and has retained counsel who are experienced in prosecuting class actions. Plaintiff acknowledges that she has an obligation to make known to the Court any relationship, conflicts or differences with any Class Member. Plaintiff's attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

## VI.    FACTS RELATING TO PLAINTIFF AS A PRIVATE ATTORNEY GENERAL

130. At all times set forth herein, PAGA was applicable to Plaintiff's employment by Defendants.

131. At all times set forth herein, PAGA provides that, notwithstanding any other provision of law, any provision of law under the California Labor Code that provides for a civil penalty, including unpaid wages and premium wages, to be assessed and collected by the California Labor & Workforce Development Agency ("LWDA") for violations of the California Labor Code may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of the aggrieved employee and other current or former employees pursuant to procedures set forth in California Labor Code § 2699.3.

132. Pursuant to PAGA, a civil action may be brought by an "aggrieved employee," who is any person that was employed by the alleged violator and against whom one or more of the alleged violations was committed.

133. Plaintiff was employed by Defendants and the alleged violations were committed against her and she is, therefore, an aggrieved employee. Likewise, the other Brand Promoters who

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

worked within the relevant time are "aggrieved employees" as defined by California Labor Code § 2699(c) in that they are current or former employees of Defendants and one of more of the alleged violations were committed against them.

134. Pursuant to California Labor Code §§ 2699.3 and 2699.5, an aggrieved employee, including Plaintiff, may pursue a civil action arising under PAGA after the following requirements have been met:

a) The aggrieved employee shall give written notice (hereinafter "Employee's Notice") to the LWDA and the employer of the specific provisions of the Labor Code alleged to have been violated, including the facts and theories to support the alleged violations.

b) The LWDA shall provide notice (hereinafter "LWDA Notice") to the employer and the aggrieved employee that it does not intend to investigate the alleged violation within sixty (60) calendar days of the postmark date of the Employee's Notice. Upon receipt of the LWDA Notice, or if the LWDA Notice is not provided within sixty-five (65) calendar days of the Employee's Notice, the aggrieved employee may commence a civil action pursuant to California Labor Code section 2699 to recover civil penalties in addition to any other penalties to which the employee may be entitled.

135. Plaintiff has satisfied these statutory requirements. On May 8, 2025, Plaintiff provided notice by electronic submission to the LWDA and by certified mail to all Defendants regarding the specific provisions of the California Labor Code alleged to have been violated, including the facts and theories to support the alleged violations, pursuant to § 2699.3. A true and correct copy of that notice letter is attached as **Exhibit B**. The LWDA has not expressly stated that it will intervene or investigate, or otherwise responded regarding Plaintiff's asserted PAGA claims against Defendants herein.

/ / /

/ / /

/ / /

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

1

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Failure to Pay Minimum Wages and Liquidated Damages)**
**Cal. Lab. Code §§ 1182.12, 1194, 1197, 1197.1, 1198, 558.1, 1194.2, 558(a); IWC Wage Order 4-2001**

*Against Le-Vel Brands, LLC; Jason Camper; Paul Gravette; Sophary Ly; Cliff Gallagher; Jayson Jorgensen; Shelley Hill; Shannon Schmidt; Chante Markus; and Does 1–50, inclusive*

136.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

137.    At all relevant times, California Labor Code §§ 1182.12, 1194, 1197, 1197.1, and 1198 have provided that the minimum wage for employees fixed by the Industrial Welfare Commission is the minimum wage to be paid to employees, and the payment of a wage less than the minimum so fixed is unlawful. California law provides employees in California must be paid for all hours worked, up to 40 per week or eight (8) per day, at a regular time rate no less than the mandated minimum wage. Compensable work time is defined by the applicable wage order as "the time during which an employee is subject to the control of an employer and includes all the time the employee is suffered or permitted to work, whether or not required to do so." Cal. Code Regs. Tit. 8, § 11070(2)(G) (defining "Hours Worked").

138.    As alleged herein, during the relevant time period, Le-Vel maintained and still maintains a policy of requiring employees to work off-the-clock, without compensation. Le-Vel only compensates Brand Promoters, including Plaintiff, based on specific sales placed through the Le-Vel website, and does not pay wages for other hours worked. These hours include time spent doing the following, inter alia:

      a)  in training;

      b)  making and responding to social media posts;

      c)  purchasing inventory from Le-Vel;

      d)  communicating with other Brand Promoters about policies, practices, and sales instructions and guidance;

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

e)  communicating with customers after their purchases were made to handle routine customer service; and

f)  handling other responsibilities as needed.

Plaintiff and Class Members performed these activities throughout the day, nearly every day, often in short increments adding up to two hours a day.

139.  Le-Vel provided no way for Plaintiff and Class Members to log time spent and submit to Le-Vel.

140.  Le-Vel's failure to pay Plaintiff and Class Members for work, and failure to pay overtime wages owed, also resulted in failures to pay Plaintiff and Class Members the minimum wage required, in violation of California Labor Code §§ 1182.12, 1194, 1197, 1197.1, 1198. In addition, Le-Vel's failure to pay for hours worked is a violation of various municipal and county codes across the state, including, but not limited to City of Los Angeles Municipal Code Art. 7; County of Los Angeles Code § 8.100.040, *et seq*., San Francisco Cal. Code 12R.

141.  California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for minimum wage violations. *See* Cal. Lab. Code § 558.1. Defendants LE-VEL BRANDS, LLC; JASON CAMPER; PAUL GRAVETTE; SOPHARY LY; CLIFF GALLAGHER; JAYSON JORGENSEN; SHELLEY HILL; SHANNON SCHMIDT; CHANTE MARKUS; AND DOES 1–50, inclusive, failed to pay Plaintiff and other aggrieved employees the minimum wage and all Defendants are liable for causing this violation under § 558.1.

142.  As such, pursuant to California Labor Code § 1194.2, Plaintiff and Class Members are entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon. Pursuant to § 558(a), Plaintiff and Class Members are also entitled to recover unpaid wages and statutory damages in the amount of $50 for any initial violation per employee for each pay period and $100 for each subsequent violation per employee for each pay period and interest pursuant to § 218.6.

/ / /

/ / /

1

2

3

4

## **SECOND CAUSE OF ACTION**

**(Failure to Timely Pay Wages During Employment)**
**Cal. Lab. Code §§ 204, 210(a), 218.6**

***Against Le-Vel Brands LLC and Does 1–50, inclusive***

5

6

143.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

7

8

9

10

11

12

13

144.   At all relevant times herein set forth, California Labor Code § 204 requires that all wages earned by any person in any employment between the 1st and the 15th days, inclusive, of any calendar month, other than those wages due upon termination of an employee, are due and payable between the 16th and the 26th day of the month during which the labor was performed, and that all wages earned by any person in any employment between the 16th and the last day, inclusive, of any calendar month, other than those wages due upon termination of an employee, are due and payable between the 1st and the 10th day of the following month.

14

15

145.   California Labor Code § 204 also requires that all wages earned for labor more than the normal work period shall be paid no later than the payday for the next regular payroll period.

16

17

18

19

20

146.    During the relevant period, Le-Vel failed to pay Plaintiff and the Class, as well as all other aggrieved employees, all wages due to them, including minimum wages, overtime wages, and meal and rest period premium wages, within any time period specified by § 204. Moreover, Le-Vel failed to pay Plaintiff or other aggrieved employees earned commissions in a timely and complete fashion.

21

22

23

24

25

147.   As such, pursuant to California Labor Code § 210(a), Plaintiff and Class Members are entitled to recover stator damages in the amount of $100 for any initial violation per failure to pay each employee and $200 for each subsequent, or willful or intentional violation for each failure to pay each employee, plus 25 percent of the amount unlawfully withheld, and interest pursuant to § 218.6.

26

/ / /

27

/ / /

28

/ / /

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

**THIRD CAUSE OF ACTION**

**(Failure to Keep Requisite Payroll Records)
Cal. Lab. Code § 1174(d), 1174.5**

***Against Le-Vel Brands, LLC and Does 1–50, inclusive***

148.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

149.   California Labor Code § 1174(d) requires an employer to keep, at a central location in the state or at the plants or establishments at which employees are employed, payroll records showing the hours worked daily by and the wages paid to, and the number of piece-rate units earned by and any applicable piece rate paid to, employees employed at the respective plants or establishments. These records shall be kept in accordance with rules established for this purpose by the commission, but in any case, shall be kept on file for not less than two years.

150.   At all times herein set forth, California Labor Code § 1174.5 has imposed a civil penalty of $500 per aggrieved employee for each willful failure "to maintain . . . accurate and complete records required by subdivision (d) of Section 1174[.]"

151.   Le-Vel has intentionally and willfully failed to keep accurate and complete payroll records showing the hours worked daily and the wages paid to Plaintiff. For example, any records kept by Le-Vel did not include the hours worked off-the-clock, the premium wages owed, and for missed and non-compliant meal and rest breaks.

152.   Plaintiff has been injured by Le-Vel's intentional and willful violation of California Labor Code § 1174(d) because they were denied both their legal right and protected interest, in having available, accurate and complete payroll records pursuant to § 1174(d).

/ / /

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOURTH CAUSE OF ACTION**

**(Failure to Provide Timely and Accurate Wage Statements)**
**Cal. Lab. Code §§ 226(a), 1198, 226.3, 558.1, 226(e)**

*Against Le-Vel Brands, LLC; Jason Camper; Paul Gravette; Sophary Ly; Cliff Gallagher;*
*Jayson Jorgensen; Shelley Hill; Shannon Schmidt; Chante Markus; and Does 1–50, inclusive*

153.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

154.   At all relevant times herein set forth, California Labor Code § 226(a) provides that, at the time of each payment of wages, the employer must provide each employee with an itemized statement showing gross wages earned, total hours worked, all deductions taken, net wages earned, the inclusive dates for which the employee is being paid, the employee's name and last four digits of their social security number, the name and address of the legal entity that is the employer, and all applicable hourly rates in effect during the pay period and all hours worked at each rate.

155.   California Labor Code § 1198 provides that the maximum hours of work and the standard conditions of labor shall be those fixed by the Labor Commissioner and as set forth in the applicable IWC Wage Orders. Section 1198 further provides that "[t]he employment of any employees for longer hours than those fixed by the order or under conditions of labor prohibited by the order is unlawful." Pursuant to the applicable IWC Wage Order, employers are required to keep accurate time records showing when the employee begins and ends each work period and meal period.

156.   At all times herein set forth, California Labor Code § 226.3 has imposed a civil penalty in addition to any other penalty provided by law of two hundred fifty dollars ($250) per aggrieved employee for the first violation of § 226(a), and one thousand dollars ($1,000) per aggrieved employee for each subsequent violation.

157.   As alleged herein, Le-Vel knowingly and willfully failed to provide Plaintiff and the Class with proper, itemized wage statements. Wage statements provided to Plaintiff and the Class did not show total/actual hours worked and all applicable hourly rates in effect during the pay period and all hours worked at each rate. The wage statements provided to Plaintiff and the Class failed to reflect all time spent in training, making and responding to social media posts, making business

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1  expenditures by stocking their own Le-Vel inventory, and communicating with other Brand

2  Promoters about policies, practices, and sales instructions and guidance. Le-Vel's refusal to properly

3  record this time, and to include it in its itemized wage statements, or to properly pay its employees

4  for this time was willful and intentional. As a result of these violations, Plaintiff and the Class

5  suffered injury because they were not paid for all hours worked.

6      158.   California Labor Code § 558.1 states that any employer or person acting on behalf of

7  an employer who causes a violation is liable, among other things, for wage statement violations. *See*

8  Cal. Lab. Code § 558.1. Defendants LE-VEL BRANDS, LLC; JASON CAMPER; PAUL

9  GRAVETTE; SOPHARY LY; CLIFF GALLAGHER; JAYSON JORGENSEN; SHELLEY HILL;

10  SHANNON SCHMIDT; CHANTE MARKUS; AND DOES 1–50, inclusive, failed to provide

11  Plaintiff and the Class accurate wage statements and all Defendants are liable for causing this

12  violation under § 558.1.

13      159.   Pursuant to California Labor Code § 226(e), Plaintiff and the Class are entitled to a

14  penalty in the amount of fifty dollars ($50) for the initial pay period in which a violation occurred,

15  and a penalty of one-hundred dollars ($100) for each violation in a subsequent pay period, up to an

16  aggregate penalty of four-thousand dollars ($4,000), as well as costs of suit and attorneys' fees, all

17  in an amount according to proof.

18                        **FIFTH CAUSE OF ACTION**

19                      **(Failure to Reimburse Business Expenses)**
        **Cal. Lab. Code §§ 450, 2802, 558.1; IWC Wage Order 4-2001**
20      ***Against Le-Vel Brands, LLC; Jason Camper; Paul Gravette; Sophary Ly; Cliff Gallagher;***
     ***Jayson Jorgensen; Shelley Hill; Shannon Schmidt; Chante Markus; And Does 1–50, inclusive***
21

22      160.   Plaintiff realleges and incorporates by reference all preceding allegations as though

23  fully set forth herein.

24      161.   At all times herein set forth, California Labor Code § 2802 has provided and provides

25  that an employer must reimburse employees for all necessary expenditures and losses incurred by

26  the employee in the performance of their job. The purpose of § 2802 is to prevent employers from

27  passing off their cost of doing business and operating expenses on to their employees. *Cochran v.*

28  *Schwan's Home Service, Inc.*, 228 Cal. App. 4th 1137, 1144 (2014). The applicable wage order,

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

IWC Wage Order 4-2001, paragraph 9(B) provides that: "When tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer, except that an employee whose wages are at least two (2) times the minimum wage provided herein may be required to provide and maintain hand tools and equipment customarily required by the trade or craft." Le-Vel's conduct, in misclassifying their Brand Promoters as independent contractors and failing to reimburse them for expenses Brand Promoters paid that should have been borne by their employer, constitutes a violation of California Labor Code §§ 450 and 2802.

162.    Le-Vel violates California Labor Code § 2802 by having failed, and failing, to reimburse Plaintiff and the Class for their business-related expenses. These expenses include the business expenses, as set forth *supra* § IV.E, which Le-Vel did not reimburse. And during the relevant period, Le-Vel required that Plaintiff and the Class use their own personal cellular phones and/or cellular phone data to carry out Le-Vel's business operations, but failed to reimburse them for the full costs of their work-related cellular phone expenses. For example, Plaintiff and the Class were required to use a personal cellular phone to make social media posts and communicate with customers and their upline. Plaintiff and the Class also incurred expenses associated with maintaining a home internet connection. Le-Vel did not reimburse Brand Promoters for these expenses.

163.    Le-Vel's company-wide policy and/or practice of passing on their operating costs to Plaintiff and the Class violates California Labor Code § 2802. At all times described herein, Le-Vel has acted willfully, and deliberately with oppression, fraud and malice to unlawfully deprive their employees of the employees' own personal resources in furtherance of Le-Vel's profits.

164.    California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for failure to reimburse business expenses. *See* Cal. Lab. Code § 558.1. Defendants LE-VEL BRANDS, LLC; JASON CAMPER; PAUL GRAVETTE; SOPHARY LY; CLIFF GALLAGHER; JAYSON JORGENSEN; SHELLEY HILL; SHANNON SCHMIDT; CHANTE MARKUS, AND DOES 1–50, inclusive, failed to

reimburse business expenses to Plaintiff and the Class and all Defendants are liable for causing this violation under § 558.1.

165.   As a result of Le-Vel's failure to reimburse Plaintiff and the Class for all business-related expenses, pursuant to California Labor Code § 2802, Plaintiff and the Class are entitled to recover unreimbursed business expenses, plus attorneys' fees and costs, in an amount according to proof.

## SIXTH CAUSE OF ACTION

### (Unfair Competition)
### Bus. & Prof. Code § 17200 *et seq.*

### *Against Le-Vel Brands and Does 1–50, inclusive*

166.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

167.   From a date unknown to Plaintiff and continuing to the present, Le-Vel has and continues to engage in business acts or practices that constitute unfair competition as defined in the Unfair Competition Law, Business and Professions Code § 17200 *et seq.*, in that such business acts and practices are unlawful and unfair within the meaning of that statute.

### *"Unlawful" Prong*

168.   Le-Vel has violated section 17200's prohibition on unlawful conduct through the following violations:

    a)  Failing to pay minimum wages, as set forth in the First Cause of Action;

    b)  Failing to timely pay wages during employment, as set forth in the Second Cause of Action;

    c)  Failing to keep requisite payroll records, as set forth in the Third Cause of Action;

    d)  Failing to provide timely and accurate wage statements, as set forth in the Forth Cause of Action; and

    e)  Failing to reimburse business expenses, as set forth in the Fifth Cause of Action.

169.   The forgoing unlawful conduct of Le-Vel alleged herein constitutes unfair competition within the meaning of California Business and Professions Code § 17200 *et seq.*

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

### *"Unfair" Prong*

170.   Le-Vel has violated California Business and Professions Code § 17200's prohibition on unfair conduct by engaging in each of the forgoing unlawful acts.

171.   Furthermore, as set forth *supra* Section IV.B.6, Le-Vel has violated § 17200's prohibition on unfair conduct by unfairly and unconscionably structuring its Agreement and business activities in a way that does not create meaningful opportunities for Brand Promoters earn a fair wage and/or commission for their work. Le-Vel used its superior bargaining power, superior market power, and take-it-or-leave-it Agreement to prevent Brand Promoters from exercising discretion and accessing tools and resources needed to market the products effectively and competitively to generate profits. And Le-Vel further undermined Brand Promoters' ability to earn compensation by engaging in activities in competition with the Brand Promoters, by for example, maintaining the exclusive right to disseminate online advertising to any customer sales leads generated by the Brand Promoters and selling products via Amazon.com. By denying Brand Promoters meaningful opportunities to earn fair commission, Le-Vel also unfairly incentivized Brand Promoters to divert time and attention away from marketing the sale of products to retail customers to marketing the opportunity to become a Brand Promoter to unsuspecting members of the California public. So long as Defendants continue these unfair practices, the California public remains at risk for being recruited into Le-Vel and similarly harmed.

172.   Le-Vel's unfair acts were in contravention of public policy. California public policy encourages the proper classification of workers to ensure that workers are fairly compensated and provided the full benefits and protections of employment, competitors are operating in a fair and honest marketplace, and the state is not deprived of tax revenue.

173.   Le-Vel's unfair acts were immoral, unethical, oppressive, unscrupulous, and substantially injurious to the Class and general public. Le-Vel knowingly and willfully classified the Brand Promoters as independent contractors. And it knowingly and willfully structured an unfair and unconscionable Agreement that did not provide for meaningful opportunities to earn compensation, while engaging in business activities that would further frustrate Brand Promoters' efforts to earn compensation.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

174.   The impact on the Class and general public is not outweighed by any countervailing benefits. To the extent any benefits inured to Plaintiff, the Class, and the general public, those benefits are outweighed by the impact of Defendants' unfair acts. Brand Promoters, including Plaintiff, incurred substantial costs in working as Brand Promoters, and were not paid appropriately and fairly for their time and efforts. They could have chosen other opportunities or invested that time and money into other legitimate and fairly paying endeavors.

175.   As a result of Le-Vel's unfair competition as alleged herein, Plaintiff and the Class have suffered injury in fact and lost money or property, as described in more detail above. Pursuant to California Business and Professions Code § 17200, *et seq.*, Plaintiff and the Class are entitled to restitution of all wages and other monies rightfully belonging to them that Le-Vel failed to pay and wrongfully retained by means of its unlawful and unfair business practices, and and/or all other equitable remedies that may be available.

176.   To prevent Le-Vel from continuing to prey on the California public through their misclassification of their Brand Promoters, and recruitment of new Brand Promoters under these false pretenses, Plaintiff and the Class also seek a public injunction against Defendants enjoining Le-Vel, and any and all persons acting in concert with them, from engaging in each of the California Labor Code violations set forth herein and from recruiting new Brand Promoters or authorizing others to recruit new Brand Promoters, under a misclassified status, including making representations about that status and the commission-based compensation structure.

## SEVENTH CAUSE OF ACTION

### (Violation of Cal. Lab. Code §§ 2698-2699.8)
*Against Le-Vel Brands, LLC; Jason Camper; Paul Gravette; Sophary Ly; Cliff Gallagher; Jayson Jorgensen; Shelley Hill; Shannon Schmidt; Chante Markus; And Does 1–50, Inclusive*

177.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

178.   PAGA establishes that, notwithstanding any other provision of law, any provision of the California Labor Code which provides for a civil penalty to be assessed and collected by the LWDA, or any of its departments, divisions, commissions, boards, agencies or employees for a

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

violation of the California Labor Code, may be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself, and other current or former employees.

179. Whenever the LWDA, or any of its departments, divisions, commissions, boards, agencies, or employees has discretion to assess a civil penalty, a court in a civil action is authorized to exercise the same discretion, subject to the same limitations and conditions, to assess a civil penalty.

180. Plaintiff and the other Brand Promoter employees are "aggrieved employees" as defined by California Labor Code § 2699(c) in that they are all current or former employees of Defendants, and one or more of the alleged violations were committed against them.

181. Defendants' conduct, as alleged herein, violates numerous sections of the California Labor Code, including, but not limited to, the following:

    a) Failing to pay minimum wages, as set forth in the First Cause of Action;

    b) Failing to timely pay wages during employment, as set forth in the Second Cause of Action;

    c) Failing to keep requisite payroll records, as set forth in the Third Cause of Action;

    d) Failing to provide timely and accurate wage statements, as set forth in the Forth Cause of Action;

    e) Failing to reimburse business expenses, as set forth in the Fifth Cause of Action; and,

    f) Willfully misclassifying Brand Promoters as independent contractors, in violation of California Labor Code §§ 226.8 and 2775.

182. Pursuant to PAGA, and in particular California Labor Code §§ 2699(a), 2699.3, and 2699.5, Plaintiff, acting in the public interest as a private attorney general, seeks assessment and collection of civil penalties for Plaintiff, all other aggrieved employees, and the State of California against Defendants, in fixed amounts for each aggrieved employee for every pay period in which there was a violation, per § 2699(f), in addition to other remedies, for violations of Labor Code sections set forth herein.

183.   Pursuant to California Labor Code § 2699(i), civil penalties recovered by aggrieved employees shall be distributed as follows: seventy-five percent (75%) to the LWDA for the enforcement of labor laws and education of employers and employees about their rights and responsibilities and twenty-five (25%) to the aggrieved employees.

184.   Further, and as authorized by the California Labor Code § 2699(g), Plaintiff seeks recovery of her attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION
### (Violation of Cal. Lab. Code §§ 2698-2699.8)
*Against Le-Vel Brands, LLC; Jason Camper; Paul Gravette; Sophary Ly; Cliff Gallagher; Jayson Jorgensen; Shelley Hill; Shannon Schmidt; Chante Markus; and Does 1–50, inclusive*

185.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

186.   PAGA establishes that, notwithstanding any other provision of law, any provision of the California Labor Code which provides for a civil penalty to be assessed and collected by the LWDA, or any of its departments, divisions, commissions, boards, agencies or employees for a violation of the California Labor Code, may be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself, and other current or former employees.

187.   Whenever the LWDA, or any of its departments, divisions, commissions, boards, agencies, or employees has discretion to assess a civil penalty, a court in a civil action is authorized to exercise the same discretion, subject to the same limitations and conditions, to assess a civil penalty.

188.   Plaintiff and the other Brand Promoter employees are "aggrieved employees" as defined by California Labor Code § 2699(c) in that they are all current or former employees of Defendants, and one or more of the alleged violations were committed against them.

189.   Defendants' conduct, as alleged herein, violates numerous sections of the California Labor Code, including, but not limited to, the following:

a)   Failing to pay minimum wages, as set forth in the First Cause of Action;

b)   Failing to timely pay wages during employment, as set forth in the Second Cause of Action;

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

c)   Failing to keep requisite payroll records, as set forth in the Third Cause of Action;

d)   Failing to provide timely and accurate wage statements, as set forth in the Fourth Cause of Action; and

e)   Failing to reimburse business expenses, as set forth in the Sixth Cause of Action; and

f)   Willfully misclassifying Brand Promoters as independent contractors, in violation of California Labor Code §§ 226.8 and 2775.

190.   Pursuant to PAGA, and in particular California Labor Code §§ 2699(a), 2699.3, and 2699.5, Plaintiff, acting in the public interest as a private attorney general, seeks assessment and collection of civil penalties for Plaintiff, all other aggrieved employees, and the State of California against Defendants, in fixed amounts for each aggrieved employee for every pay period in which there was a violation, per § 2699(f), in addition to other remedies, for violations of Labor Code sections set forth herein.

191.   Pursuant to California Labor Code § 2699(i), civil penalties recovered by aggrieved employees shall be distributed as follows: sixty-five percent (65%) to the LWDA for the enforcement of labor laws and education of employers and employees about their rights and responsibilities and thirty-five (35%) to the aggrieved employees.

192.   Further, and as authorized by the California Labor Code § 2699(g), Plaintiff seeks recovery of her attorneys' fees and costs.

## VIII. <u>PRAYER FOR RELIEF</u>

WHEREFORE Plaintiff and the Class pray for judgment and relief as follows:

(1)   An order certifying that this action may be maintained as a class action, that Plaintiff be appointed Class Representative, and that Plaintiff's counsel be appointed Class Counsel;

(2)   Statutory penalties and compensatory damages as authorized under the California Labor Code;

(3)   Civil penalties pursuant to California's Private Attorneys General Act;

(4)   Restitution and all other equitable remedies pursuant to California's Unfair Competition Law;

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

(5)    Public Injunctive relief, pursuant to California's Unfair Competition Law, prohibiting Le-Vel, its officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, whether acting directly or indirectly, in connection with the management, hiring, or coordination of Brand Promoters, or the advertising, promotion, or recruitment of new Brand Promoters, from:

a.    Engaging in the California Labor Code violations as alleged herein, including classifying Brand Promoters as non-employees or independent contractors;

b.    Recruiting new Brand Promoters or authorizing others to recruit new Brand Promoters, under a misclassified status, including making representations about that status and the commission-based compensation structure.

(6)    Punitive damages against the individual officer, director or managing agent Defendants pursuant to Cal. Civil Code § 3294;

(7)    Reasonable attorneys' fees pursuant to the California Labor Code, including §§ 226(e), 2699(g), and Code of Civil Procedure § 1021.5;

(8)    Costs of this suit per California Labor Code § 2699(g);

(9)    Pre- and post-judgment interest pursuant to Labor Code section 218.6; and

(10)    Such other and further relief as the Court may deem just and proper.

## IX.    DEMAND FOR TRIAL BY JURY

Plaintiff and the Class hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

DATED: July 14, 2025

**CLARKSON LAW FIRM, P.C.**

By: */s/ Kristen G. Simplicio*
Kristen G. Simplicio
Glenn A. Danas
Maxim Gorbunov
Cody Laux

*Attorneys for Plaintiff and Putative Class*